UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------------------- X
                                          :

MUNIR POCESTA,                     :       11-cv-916 (ARR)

              Petitioner,          :       NOT FOR ELECTRONIC
                                            :       OR PRINT PUBLICATION
     -against-                 :
                                            :       OPINION AND ORDER

SUPERINTENDANT M. BRADT,    :

             Respondent.       :
                                            :
-------------------------------------------------------------------- X

ROSS, United States District Judge:

    On February 17, 2011, Munir Pocesta ("Pocesta" or "petitioner"), appearing pro se, filed

a petition for a writ of habeas corpus challenging his criminal conviction pursuant to 28 U.S.C. §

2254.[1] Pocesta claims that he was denied due process and a right to a fair trial because, during

summation at trial, the prosecutor: (1) denigrated defense counsel by implying that he had an

unrealistic view, based on sensationalized fiction, of how police investigations unfold; (2)

accused defense counsel of misrepresenting a witness's trial and grand jury testimony; and (3)

vouched for the credibility of police witnesses. For the reasons stated below, the petition is

denied.

## I. Background

    On September 17, 2007, a jury convicted Pocesta in the Supreme Court of the State of

New York, Richmond County, of: (1) criminal sale of a controlled substance in the third degree,

in violation of New York Penal Law § 220.39; and (2) criminal possession of a controlled

---

[1] The petition is dated February 17, 2011 on the signature block but was not filed until February 21, 2011. Dkt. #1, at 1, 16.

substance in the seventh degree, in violation of New York Penal Law § 220.03.[2] Dkt. #1, at 1. According to the evidence at trial, Pocesta sold $70 worth of crack cocaine to an undercover officer during a "buy-and-bust" operation and dropped an additional quantity of crack cocaine at the time of his arrest. The key evidence at trial consisted of the testimony of three police officers involved in the undercover operation.

## A.    The "Buy-and-Bust" Operation

On December 7, 2006, Undercover Detective #597, ("UC #597" or "the undercover"), Undercover Detective #427 ("UC # 427" or "the ghost"), Detective Raymond Wittick ("Wittick"), and other members of a Staten Island narcotics field team met to discuss a "buy and bust" drug operation scheduled for later that day. Trial Transcript ("Tr.") 33-35, 101-04, 177-78. The undercover and ghost were, respectively, given $70 and $30 of "prerecorded buy money" that the police department had photocopied beforehand. Id. at 33, 36, 101-04, 177-78.

That afternoon, the field team proceeded as planned to the Stapleton area of Long Island around Grove Street and Gordon Street. Id. at 37-38, 105, 178-79. The undercover wore a Kell device, a one-way transmitter through which the rest of the team could hear what was happening near him. Id. at 35. In addition, each member of the field team carried a point-to-point radio, through which they could communicate with one another. Id. at 134.

The undercover sat down on a stoop at 86 Gordon Street, while the ghost set up on the opposite side of the street. Id. at 39. The ghost gave a play by play description of the events that followed to the rest of the field team. Id. at 208. Soon after the undercover sat down, Pocesta

---

[2] Pocesta also pled guilty to conspiracy in the second degree, in violation of New York Penal Law § 105.15. Dkt. #1, 1. Should the court grant his habeas petition, Pocesta argues, then it should also allow him to withdraw his guilty plea. Id. at 19. Pocesta explains that he pled guilty to the conspiracy charge based on an understanding that the indeterminate sentence of four-and-a-half to nine years would run concurrently with, and not exceed, the nine-year sentence for his two jury convictions. Id. Accordingly, Pocesta argues that he will lose the benefit of his plea bargain if the court sets aside his trial conviction. Id. Because the court denies Pocesta's habeas petition, it need not address this argument.

came to the corner of Gordon Street and Purroy Street. Id. at 40, 180. Whereas the undercover testified that he walked toward Pocesta, id. at 40, the ghost stated that petitioner first approached the undercover on the stoop and that the two walked over to the corner together, id. at 180.

In any event, the undercover asked Pocesta whether anyone had any "crills," a reference to crack cocaine. Id. at 40. When petitioner asked how much the undercover was looking for, the latter replied that he wanted $70 worth of crack cocaine. Id. Pocesta responded by handing the undercover a piece of crack cocaine wrapped in a plastic twist; in exchange, the undercover gave him $70 of the prerecorded buy money. Id. at 40-41. The undercover then gave a "positive buy sign" to the ghost, id. at 41, who transmitted that information to the rest of the field team, id. at 209.

Pocesta proceeded down Gordon Street toward Grove Street, where Wittick had been waiting in an unmarked SUV and listening to the ghost's transmissions. Id. at 122-25, 131-33, 139-40. The ghost and undercover trailed behind Pocesta. Id. at 79-80; 143-44; 182-84. Wittick testified at trial that he had seen petitioner and the undercover engaged in conversation on the opposite side of the street from where Wittick was parked, but that he had not observed the actual drug transaction. Id. at 140-41. However, Wittick subsequently admitted that he had previously told the grand jury that his "first visual contact" with Pocesta had occurred only following the transaction, after the ghost informed Wittick that petitioner had crossed over to the side of the street where Wittick was parked. Id. at 153.

Subsequently, Wittick followed Pocesta up Grove Street toward Court Street. Id. at 108. Wittick radioed the ghost to confirm whether he has following the right person, and the ghost responded affirmatively. Id. at 108-09. When Pocesta tried to enter an apartment complex on Court Street, Wittick arrested him. Id. at 109. At that point, Pocesta dropped a small piece of

3

crack cocaine wrapped in a plastic twist, which Wittick recovered. Id. at 109-110. Wittick also

recovered the prerecorded $70 from petitioner. Id. at 111. In addition, both the undercover and

the ghost arrived at the arrest location and saw Pocesta in Wittick's custody. Id. at 61, 185.

The police did not use any audio or video to record the drug transaction. Id. at 65, 73-77,

154. Nor did they test the buy money or plastic twists for fingerprints. Id. at 154, 172.

## B.    Pocesta's Trial

The undercover, ghost, and Wittick all testified against Pocesta at trial. Thomas Reilly,

Pocesta's counsel, cross-examined each of these witnesses. However, the defense did not call

any of its own witnesses.

### 1.    Defense counsel's closing argument

During his closing argument, Reilly underscored the prosecution's lack of corroborating

audio, video, photographic, and fingerprint evidence. Id. at 242-65. For example, he asserted

that "there was absolutely no surveillance equipment of any kind in this case" and that the field

team "used no video cameras when they were able to in a day and age when people are caught on

tape every day." Id. at 243. Reilly likewise noted that the undercover "didn't have any pin hole

camera or tiny cameras made so popular by investigative reporters," and called it "inexcusable"

that the field team could have, but did not, "[catch] the whole apprehension on tape." Id. at 244.

He further attempted to undermine the prosecution's case as follows:

> Here we are in 2007. A ton of technology at our fingertips as well as the
> police. We live in an age where most people have cameras in their cell phones
> but they couldn't take a second to click off a picture of the defendant or take a
> video or dust for fingerprints.
> These detectives could have at least recorded the Kell conversations with a
> $10 tape recorder. They didn't. They would ask you to have blind faith in their
> testimony. And faith alone doesn't justify conviction in this case.

Id. at 263.

In addition, Reilly attempted to draw the jury's attention to inconsistencies in the government witnesses' testimonies. He first pointed to what he characterized as a "pretty amazing contradiction" in the officers' testimonies regarding the circumstances under which the undercover encountered Pocesta:

> Undercover Officer 597, the primary, says he then approaches Mr. Pocesta and goes to make an interaction with him. But this is even more interesting,[] this testimony, because it directly contradicts the ghost's testimony, 427.
> How? The primary says he goes up to Mr. Pocesta and interacts. When I asked the ghost, 427, he said Mr. Pocesta approached the primary undercover. . . .
> Both these officers are testifying under oath. If they didn't remember, they could have just said I don't remember who approached who . . . . But instead, one of them is testifying falsely.

Id. at 250.

Reilly also discussed his recollection of the inconsistencies between Wittick's trial and grand jury testimonies regarding the circumstances under which Wittick first saw Pocesta:

> I could have sworn that Detective Wittick got up there and said he saw the whole thing and that he saw the defendant coming down the street afterwards and he saw him turn the corner and go up. And it wasn't until cross examination when I asked him about a hearing that was conducted on July 25th where I asked him.
> Question: "When did you first have visual contact with my client?"
> Answer: Minutes after, maybe not even minutes. Seconds after the ghost said he crossed over the street and came into my line of sight, fairly quickly, as I saw him come down the sidewalk in my direction."
> Once again, he said after the ghost had said he crossed the street.
> He testified up there, and I'm sure of that, where Mr. Pocesta crossed. But he admits back at the hearing it was after he crossed the street and the undercover officer radioed in.
> He's wrong. One way or another, he's got it wrong. It's a huge inconsist[e]ncy that screams out reasonable doubt.

Id. at 257.

## 2.     The prosecutor's summation

The prosecutor, David Frey, opened his summation by vouching for the credibility of the testifying officers:

5

Either the defendant sold crack to Undercover 587 or all three police officers are lying. There's no gray area. Either he dropped more when he was arrested and was found with the prerecorded buy money on him, or they were lying.

Either these three detectives are endangering their career, their pensions—

MR. REILLY: Objection, your Honor.

THE COURT: You made an argument at least twice that at least one of the officers was testifying falsely so I'll permit a fair response. But I won't let you go too far with that, Mr. Frey.

MR. FREY: Thank you, Judge.

And perjure each other—

REILLY: Objection.

THE COURT: Overruled. Same ruling.

MR. FREY: Or the defendant is guilty of all the charges in the indictment.

Id. at 266. Later, Frey again maintained that the police witnesses had a motive not to lie:

Did they have a motive to lie? I think it's the exact opposite that they have. They have the exact opposite. They want to get the guy who sold the drugs. They want to take a drug dealer off the street, not a random person walking down the street. They don't want to risk their pension or be charge[d] with perjury.

MR . REILLY: Objection.

THE COURT: I'll sustain the objection as to the pension comment.

MR. FREY: They don't want to damage their reputation.

Id. at 281.

Frey also countered Reilly's arguments that the government's case required further

corroboration:

Mr. Reilly is correct. There's no DNA, fingerprint or audio. I told you that during voir dire. You all assured me you would listen to the testimony, not speculate on what could have happened but what actually happened, right here. That you'll consider the testimony and not speculate as to what a TV writer would have done.

There are no laser beams, either. This isn't a TV writer coming up with what could have happened but what actually happened. This is what happens when detectives go out on the streets to clean up—

MR. REILLY: Objection as to what detectives do when they go out on the streets.

THE COURT: You['re] objecting to the comment this is what detectives do when they go on the streets?

MR . REILLY: If he wants to speak about the case, fine. But not what they normally do.

THE COURT: I think it's a rhetorical argument. Overruled.

MR. FREY: In real life, not TV but real life detectives put their lives on the line when they go out there. They are real people with real families who are working when they go out there. So they don't have a Hollywood team with them. They don't have video and audio equipment and all this other stuff.

My God, you can't believe the guy was out there with a microphone, a hidden microphone up his sleeve because Pocesta would have seen him and never would have done this[.] Yet at the same time he wants a Hollywood crew out there.

MR . REILLY: Objection.

THE COURT: Overruled.

MR. FREY: He wants microphones, boom mikes and video out there. But that's not real life. Let's take it a step farther. If I brought you audio, video and fingerprints, what would his objection be?

MR. REILLY: Objection.

THE COURT: You summed up on the lack of recording devices and cameras. I must let him respond.

MR. REILLY: He's speculating as if these things weren't available.

THE COURT: He's responding to an argument the defense made and I'll permit it if he stays within the bounds as I understand them.

Id. at 266-68.

Subsequently, the prosecutor addressed Reilly's characterization of Wittick's testimony

as having inconsistencies:

You heard one line from a transcript that he says was inconsistent, the major inconsist[e]ncy. You heard one line with no context read by the defense attorney—

MR. REILLY: Objection, your Honor. If he wants to introduce the transcript, that's fine with me.

THE COURT: Rather than Mr. Reilly reading something out of context, as you say, why don't you address the facts as you understand them?

MR. FREY: Thank you[,] Judge.

He's saying that's a lie. There is no lie there. Detective Wittick told you he couldn't see the transaction take place. Undercover 587 and 427 gave testimony about that transaction. Detective Wittick has nothing to do with what happened during the sale. What he says is he could hear what happened on the Kell and he told you he saw a person with a black jacket interacting with 597.

If he was lying, I submit he would say he was across the street and could see the tan pants and black sneakers. He couldn't. He told you he couldn't. He would have said he saw the drugs being passed. He didn't say that. He told you the truth. What he did say was that the defendant came into his line of sight as he crossed the street near Criminal Court. I submit this is consistent with him being the guy with the black jacket down there, the guy who actually crosses the street

into his line of sight who he now knows matches the description, who he now follows.

Id. at 274-75.

### 3.    Jury instructions

Following the prosecutor's summation, the trial judge issued curative instructions

pertaining to one of Frey's comments:

> You may recall early in the District Attorney's summation he made a comment regarding perjury and the officers. There was an objection midway through his comment. I overruled the objection. The D.A. then finished the thought. There was no further objection and he moved on.
> I had the entire comment read back to me by the court reporter and I'll sustain the objection now. The entire comment was to the effect that either the officers are perjuring themselves or the defendant is guilty of each and every charge.
> That's an improper comment in its entirety. I'm sustaining the objection to that entire comment, striking it from the record and I'm instructing you to strike it from your minds as if you never heard it.
> It's an improper comment. You cannot consider it and it must play no role in your deliberations.

Id. at 293-94. The judge also clarified that the attorneys' "summations, of course, are not

evidence" and that the jurors were "the sole and exclusive judges of the facts." Id. at 295.

### C.    Subsequent History

Following his conviction, Pocesta filed an appeal in the New York Supreme Court

Appellate Division on August 25, 2009. Br. for Def.-Appellant (Def.'s Br.). Pocesta's appeal

raised the same three claims that he now brings in his habeas petition. Id. The Appellate

Division affirmed, providing the following explanation:

> The defendant's claims of prosecutorial misconduct are unpreserved for appellate review, as he failed to object to many of the allegedly improper comments, made only general objections as to others, and did not request further curative instructions or move for a mistrial after the court sustained an objection and issued a curative instruction. In any event, there is no merit to the defendant's contention that he was deprived of a fair trial because the prosecutor made improper remarks during his summation. The challenged remarks were either

permissible rhetorical comment, fair response to the arguments and issues raised by the defense, fair comment on the evidence, cured by the trial court's charge to the jury to which the defendant did not object, or, if improper, were not so egregious as to deprive the defendant of a fair trial.

People v. Pocesta, 895 N.Y.S.2d 871, 871-72 (N.Y. App. Div. 2010). In a letter dated April 20, 2010, Pocesta sought leave from the New York Court of Appeals to appeal from the Appellate Division's decision. Dkt. #3-10. The Court of Appeals denied Pocesta leave, stating that "there is no question of law presented which ought to be reviewed." Dkt. #3-12.

## II. DISCUSSION

### A.    Standard of Review

The Anti-Terrorism and Effective Death Penalty Act of 1996 ("AEDPA") established a deferential standard that federal habeas courts must apply when reviewing state court convictions. 28 U.S.C. § 2254(d). The statute provides, in pertinent part:

> (d) An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim–
>
> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States . . . .

Id. The phrase "clearly established Federal law, as determined by the Supreme Court of the United States" refers to "the holdings, as opposed to the dicta, of [the Supreme] Court's decisions as of the time of the relevant state-court decision." Williams v. Taylor, 529 U.S. 362, 412 (2000). A state court decision is "contrary to" clearly established Supreme Court precedent if "the state court applies a rule that contradicts" Supreme Court precedent or if "the state court confronts a set of facts that are materially indistinguishable from a decision of [the Supreme] Court and nevertheless arrives at a result different from that precedent." Id. at 405-06. With

respect to the "unreasonable application" clause, "a federal habeas court . . . should ask whether the state court's application of clearly established federal law was objectively reasonable." Id. at 409. "Where a state court's decision is unaccompanied by an explanation, the habeas petitioner's burden still must be met by showing there was no reasonable basis for the state court to deny relief." Harrington v. Richter, --- U.S. ---, 131 S. Ct. 770, 784 (2011).

## B.    Procedurally Barred Claims

Based on the state appellate court's conclusion that "defendant's claims of prosecutorial misconduct are unpreserved for appellate review," Pocesta, 895 N.Y.S.2d at 895, respondent argues that Pocesta's claims are now procedurally barred from habeas review by this court. Defendant's Memorandum in Opposition to Writ of Habeas Corpus ("Def.'s Opp'n") 3-6.

### 1.    Legal standard

The Supreme Court has held that "the adequate and independent state ground doctrine applies on federal habeas," such that "an adequate and independent finding of procedural default will bar federal habeas review of the federal claim, unless the habeas petitioner can show cause for the default and prejudice attributable thereto, or demonstrate that failure to consider the federal claim will result in a fundamental miscarriage of justice." Harris v. Reed, 489 U.S. 255, 262 (1989) (internal citations and quotation marks omitted)).[3] In addition, "federal habeas review is foreclosed when a state court has expressly relied on a procedural default as an independent and adequate state ground, even where the state court has also ruled in the alternative on the merits of the federal claim." Velasquez v. Leonardo, 898 F.2d 7, 9 (2d Cir. 1990).

Here, notwithstanding its alternative denial of Pocesta's appeal on the merits, the state appellate court explicitly held that Pocesta's claims were "unpreserved" due to defense counsel's

---

[3] Pocesta has alleged neither cause nor prejudice with respect to any default. Dkt. #4, at 7.

inadequate objections at trial. Pocesta, 895 N.Y.S.2d at 871. "There is no question that the Appellate Division's explicit invocation of the procedural bar constitutes an 'independent' state ground, even though the court spoke of the merits of [petitioner's] claim in an alternative holding." Garcia v. Lewis, 188 F.3d 71, 77 (2d Cir. 1999) (internal citations omitted). Thus, the question is whether the procedural ground on which the state court relied is "adequate" to preclude federal habeas review. Id.

"Since the adequacy of a state procedural bar to the assertion of a federal question is itself a federal question," the court "must ascertain whether the state rule at issue here is firmly established and regularly followed, and further whether application of that rule in this case would be exorbitant." Garvey v. Duncan, 485 F.3d 709, 714 (2d Cir. 2007). Under § 470.05(2) of the New York Criminal Procedure Law, a legal question is preserved for appeal

> when a protest thereto was registered, by the party claiming error, at the time of such ruling or instruction or at any subsequent time when the court had an opportunity of effectively changing the same. Such protest need not be in the form of an "exception" but is sufficient if the party made his position with respect to the ruling or instruction known to the court . . . .

N.Y. Crim. Proc. Law § 470.05(2). The Second Circuit has held that § 470.05(2) is "firmly established and regularly followed," Garvey, 485 F.3d at 716, and that "New York courts consistently interpret § 470.05(2) to require that a defendant specify the grounds of alleged error in sufficient detail so that the trial court may have a fair opportunity to rectify any error," id. at 715. The remaining inquiry is therefore whether the state appellate court's application of that rule was "exorbitant." Id. at 714. In other words, this court must determine whether there was a "fair and substantial basis" in state law for applying the procedural default rule. Garcia, 188 F.3d at 78 (internal quotation marks omitted).

**2.     Analysis**

11

The state appellate court reasonably applied § 470.05(2) to bar Pocesta's claim that he was denied due process when the prosecutor implied that "defense counsel was distracting the jurors with phony arguments based on Hollywood fictions." Def.'s Br. 16. Although Reilly objected several times to the prosecutor's extended argument that real life investigations do not unfold like the ones on television and in films, he articulated only two reasons for these objections. First, he objected to the summation on the ground that the prosecutor could not testify as to "what detectives do when they go out on the streets." Tr. 267. Second, he objected on the ground that the prosecutor was "speculating as if these things [i.e., recording devices and cameras] weren't available" at the time of the buy-and-bust operation. Tr. at 268. Neither of these grounds coincide with the ground for alleged error that Pocesta advanced before the state appellate court. Because the trial court did not have "a fair opportunity to consider the legal issue," Garvey, 485 F.3d at 715, that Pocesta raised on direct appeal, the state appellate court had a sound basis for applying § 470.05(2) to bar consideration of that issue.

In contrast, the state appellate court lacked a fair basis for holding as unpreserved Pocesta's claim that "defense counsel had unfairly misrepresented Detective Wittick's trial and grand jury testimony." Def.'s Br. 18. After claiming that Reilly was mistaken in stating that there was "some kind of inconsist[e]ncy" in Wittick's testimony, Frey proceeded to summarize his own recollection of Wittick's testimony. Tr. 273. At that point, Reilly objected, "That's not the testimony." Id. Subsequently, Frey asserted to the jury, "You heard one line from a transcript that [Reilly] says was inconsistent, the major inconsist[e]ncy. You heard one line with no context read by the defense attorney . . . ." Id. at 274. In response, Reilly objected, "If he wants to introduce the transcript, that's fine with me." Id. The clear implication of Reilly's objections was that Frey was incorrect in accusing him of misrepresenting Wittick's testimony.

12

Accordingly, Pocesta's claim as to this issue <u>was</u> properly preserved and should not be barred from this court's consideration on habeas review. <u>See</u> <u>Williams v. Lane</u>, 826 F.2d 654, 660 (7th Cir. 1987) (deeming "inadequate" a procedural default premised on defense counsel's failure to object contemporaneously where the record revealed that the attorney had, in fact, made the required objection); <u>accord</u> <u>Garcia</u>, 188 F.3d at 78.

Despite erroneously barring Pocesta's second claim, the state appellate court fairly determined that petitioner's third claim, concerning improper prosecutorial vouching for the police witnesses, was unpreserved. At the beginning of his summation, Frey stated that "[e]ither the defendant sold crack to Undercover 587 or all three police officers are lying. . . . Either these three detectives are endangering their career, their pensions . . . [a]nd perjur[ing] each other . . . [o]r the defendant is guilty of all the charges in the indictment." Tr. 266. Reilly objected twice during these remarks, but did not specify the basis for his objections. Subsequently, the trial court issued an instruction stating that Frey's "entire comment . . . to the effect that either the officers are perjuring themselves or the defendant is guilty of each and every charge" was "an improper comment in its entirety." Tr. 293. Although the instruction did not specifically address Frey's vouching, Reilly did not object further. New York courts have held that when, "[f]ollowing the Trial Judge's curative instructions, defense counsel neither objected further, nor requested a mistrial[,] . . . the curative instructions must be deemed to have corrected the error to the defendant's satisfaction." <u>People v. Heide</u>, 84 N.Y.2d 943, 944 (1994) (citing <u>People v Williams</u>, 46 N.Y.2d 1070, 1071 (1979). Here, Reilly "neither objected further, nor requested a mistrial," <u>id.</u>, after the trial judge issued his instruction; accordingly, it must be assumed that Reilly was satisfied with the curative instructions.

Similarly, Reilly issued a general objection to the prosecutor's comment that the

13

testifying officers had a motive to tell the truth because "[t]hey don't want to risk their pension or be charge[d] with perjury." Tr. 281. After Reilly objected without specificity, the trial court responded, "I'll sustain the objection as to the pension comment." Because Reilly did not specify that he also objected to the perjury comment, the trial court did not have a fair opportunity to address the additional impropriety. See Garvey, 485 F.3d at 715. Accordingly, the state appellate court had a justifiable basis for barring Pocesta's prosecutorial misconduct claim on the basis of lack of preservation.

## C.    Pocesta's Claims Lack Merit

The gist of each of Pocesta's three claims is that he was denied due process through the prosecutor's improper summation comments. Dkt. #1, at 17. The single claim that Pocesta properly preserved, and which is therefore not barred upon habeas review, lacks merit. Furthermore, even if the state appellate court lacked an adequate basis for denying Pocesta's two other claims on procedural grounds, petitioner's habeas petition must nevertheless be denied, because those two claims also fail on the merits.

### 1.    Legal Standard

"In order to reach the level of a constitutional violation, a prosecutor's remarks must 'so infect[ ] the trial with unfairness as to make the resulting conviction a denial of due process.'" Gonzalez v. Sullivan, 934 F.2d 419, 424 (2d Cir. 1991) (alteration in original) (quoting Donnelly v. DeChristoforo, 416 U.S. 637, 643 (1974)); see also Darden v. Wainwright, 477 U.S. 168, 181 (1986; Garofolo v. Coomb, 804 F.2d 201, 206 (2d Cir. 1986). In other words, "[p]rosecutorial misconduct during summation is grounds for reversal only when the remarks caused 'substantial prejudice' to the defendant." Gonzalez, 934 F.2d at 424 (quoting United States v. Tutino, 883 F.2d 1125, 1136 (2d Cir.1989), cert. denied, 493 U.S. 1081 (1990)). Accordingly, the court

14

"must assess how prejudicial the prosecutor's conduct was, what measures, if any, the trial court used to cure the prejudice, and whether conviction was certain absent the prejudicial conduct." Id. citing (United States v. Modica, 663 F.2d 1173, 1181 (2d Cir. 1981), cert. denied, 456 U.S. 989 (1982)). "In this context, defense counsel's conduct, as well as the nature of the prosecutor's response, is relevant." United States v. Young, 470 U.S. 1, 12 (1985). Notably, "if the prosecutor's remarks were 'invited,' and did no more than respond substantially in order to 'right the scale,' such comments would not warrant [relief]." Id. at 12-13.

## 2. Analysis

Pocesta first argues that he was denied a fair trial when the prosecutor denigrated defense counsel by "implying to the jurors that trial counsel instead of focusing in real life issues was rather relying in phony based Hollywood fiction movies or life dramas." Dkt. #1, at 17. For example, the prosecutor commented that whereas Reilly "want[ed] microphones, boom mikes and video out there," the investigators did not have a "Hollywood team." Tr. 268.

The prosecutor's remarks were directly responsive to defense counsel's extensive commentary on the government's lack of corroborating audio, video, photographic, and fingerprint evidence. Reilly speculated at length about the different methods for collecting and preserving evidence that the field team could have, but did not, use. For example, he noted that the undercover "didn't have any pin hole camera or tiny cameras made so popular by investigative reporters." Tr. 243. The prosecutor's comments "did no more than respond substantially in order to 'right the scale.'" Young, 470 U.S. at 12-13. Through these comments, Frey reminded the jury that the different investigatory techniques suggested by defense counsel were simply not consistent with typical undercover drug operations. Furthermore, as respondent argues, the prosecutor's 'rhetorical flourishes' were an appropriate attempt to bring the jury's

15

attention away from speculation about what evidence could have been collected against petitioner, to the evidence actually presented at trial." Def.'s Opp'n 10. Accordingly, Frey's comments did not deprive Pocesta of a fair trial.

Petitioner also contends that he was deprived of due process when "[t]he prosecutor . . . went on to tell the jury that defense counsel had unfairly misrepresented Detective Wittick's trial and grand jury testimony." Dkt. #1, at 18. But defense counsel did, in fact, misrepresent Wittick's testimony when he characterized that testimony as indicating that Wittick had observed the actual transaction between Pocesta and the undercover; contrary to Reilly's representation, Wittick testified only to having seen the two men engaged in conversation and explicitly stated that he had not seen the transaction. At the same time, Wittick's trial testimony did diverge from his grand jury testimony as to the circumstances under which he first saw Pocesta (i.e., before or after the transaction, and on the right versus left side of the street). Tr. 273. Accordingly, the prosecutor's comment that "[t]here is no inconsist[e]ncy" was inaccurate. Id. Nonetheless, the judge subsequently instructed the jurors that the attorneys' summations are not evidence, and "[i]t must be assumed that the jury followed instructions." Trademark Research Corp. v. Maxwell Online, Inc., 995 F.2d 326, 340 (2d Cir. 1993). Furthermore, any implication by the prosecutor that Reilly had intentionally misrepresented Wittick's testimony as to these trivial details can hardly be said to have "so infected the trial with unfairness as to make the resulting conviction a denial of due process." Donnelly, 416 U.S. at 643.

Finally, Pocesta maintains that he was denied a fair trial when Frey improperly vouched for the credibility of the police witnesses. Dkt. #1, at 18. Frey's vouching was, indeed, improper. See, e.g., United States v. Spinelli, 551 F.3d 159, 168 (2d Cir. 2008). However, as the trial judge pointed out, defense counsel had "made an argument at least twice that at least one of

16

the officers was testifying falsely," Tr. 266, such that "any potential harm from [these] remark[s] was mitigated by the jury's understanding that the prosecutor was countering defense counsel's repeated attacks on the prosecution's integrity and defense counsel's argument that the evidence established no such crime," Young, 470 U.S. at 17-18. Furthermore, the court cannot conclude that the vouching substantially prejudiced Pocesta in light of the overwhelming evidence of guilt: the three officers testified definitively and, with only minor exceptions, consistently against Pocesta despite vigorous cross-examination; the government introduced into evidence the prerecorded buy money that the undercover had used to buy crack cocaine from petitioner; and the two quantities of crack cocaine recovered from the operation were also admitted into evidence.

In light of the foregoing, the state appellate court did not unreasonably apply Supreme Court precedent in rejecting Woolcock's due process claims. See 28 U.S.C. § 2254(d)(1).

### III. CONCLUSION

The petition for a writ of habeas corpus is denied. Because Pocesta has failed to make a "substantial showing of the denial of a constitutional right," 28 U.S.C. § 2253(c)(2), the court declines to issue a certificate of appealability. In addition, this court certifies pursuant to 28 U.S.C. § 1915(a)(3) that any appeal would not be taken in good faith. Coppedge v. United States, 369 U.S. 438, 444-445 (1962). The Clerk of Court is directed to enter judgment accordingly.

SO ORDERED.

/S/

Allyne R. Ross
United States District Judge

Dated:          September 27, 2012
                Brooklyn, New York